In this case, the Federal Trade Commission has challenged Equitable Acquisition of Peoples. We allege that if this acquisition were to go forward, it would have long-standing competition for gas distribution service that has long existed in western Pennsylvania and would deprive affected customers of the benefits of that competition. The deal has not yet closed, Your Honor. They were saying that initially it was almost reached, I guess, that you would get three days notice, I guess it was, if there was to be a closure in advance of the closing. Is that still on the table or is that not still on the table? That is not on the table because this court issued an injunction. Stating and pending appeal. An injunction and pending appeal. And this is an expedited appeal. And this is an expedited appeal, Your Honor. The customers who have benefited from that competition, although they are relatively few in number, they are institutional, commercial, industrial, and they, such as Duquesne University, Mercy Hospital, Forbes Nursing Center, and they in turn provide services to thousands or even tens of thousands of individual consumers. But they're getting a better deal because of it, right? They are able to bargain. They are at present able or have been in the past able to take advantage of the benefits of competition between these two natural gas distribution companies. But it's a different kind of competition because the other customers in western Pennsylvania, I guess it's just limited to western Pennsylvania, are subsidizing the discounts that those 500, I guess it's 500, larger customers are getting. Your Honor, that's an issue that would be resolved by the district court if the district court were to address the merits of the Federal Trade Commission's antitrust challenge. But the district court never addressed those issues. And in fact, that's not the issue here before this court. The only issue before this court is whether that acquisition, no matter how anti-competitive, is nonetheless exempt altogether from the antitrust laws under the antitrust state action doctrine. In fact, that doctrine does not apply because when it comes to public... Let me ask a question here. Is that the issue before this court or is really the issue before this court whether or not the district court should have granted an injunction to stop the closing? Can't this case be decided without a decision on the state action doctrine? No, Your Honor, because the district court dismissed the Federal Trade Commission's case on a 12B6 motion for the sole reason that it determined that the state action exemption applied so that it never... But you went into the district court to get an injunction... Yes, Your Honor. ...to stop the merger, correct? Yes. At the same time, you went in to stop the merger after the Pennsylvania Public Utility Commission had approved under Title 66 the merger, correct? Yes, Your Honor. But you also had pending an administrative complaint that you had filed before the FTC. Yes, Your Honor. All right. Now, isn't that complaint alive no matter what this court or the district court had done? No, Your Honor. Why not? The district court dismissed the complaint because it said... No, it dismissed your complaint in the district court. Yes, Your Honor. The Federal dismissed the administrative complaint. That's correct, Your Honor. So the administrative complaint is still alive. Yes, Your Honor. And what would happen, if I understand this correctly, the administrative complaint is alive. If, in fact, you hadn't come here at all and they had closed, you could continue on with that procedure. And if your commission found that the merger was anti-competitive, and if that was upheld in the court because they could appeal that decision, you could order a divestiture of people's, could you not? Yes, Your Honor. But those sorts of remedies are very difficult to effectuate once companies have been allowed to close the acquisition. And that's why the Federal Trade Commission Act gives the commission authority to initiate an action such as the one in the district court. Okay. I want to understand why you were here when you just answered that question. Yes, Your Honor. And that's Section 13B of the Federal Trade Commission Act, 15 U.S.C. Section 53B. That gives the Federal Trade Commission exactly this authority because Congress recognized that if acquisitions such as this one were able to close, it would be very difficult to effectuate remedies. The district court dismissed this case because it determined that it didn't even have to address the antitrust policy. Tell us why that's wrong. Why is the state action media doctrine not applicable here? The key of the state action doctrine, Your Honor, is whether the state has a clearly articulated policy to displace the protections of the antitrust laws. It has to be a clearly articulated policy. It does, but if the state allows conduct, which in the foreseeable result of that conduct could be an anti-competitive, could give you an anti-competitive result, that's enough to satisfy the clearly articulated standard, though, isn't it? Not just if it could. It's only if it is foreseeable that it would result in anti-competitive conduct. Here, the state of Pennsylvania has allowed public utility companies to engage in acquisitions, in all kinds of acquisitions. Most acquisitions raise no antitrust concerns at all. That statute, for example, requires a public utility company to obtain approval, a certificate of public convenience, if it wants to acquire a piece of public property. Yeah, but 2210B, I guess it is, specifically talks about market power, and it's clear that the Pennsylvania legislature knew that the PUC may be put in a position where it would have to be asked to approve mergers of gas companies, that a foreseeable result of that merger would be anti-competitive. And they talk about market power. And there's then a mechanism in place, and this is, I think, maybe where the dispute is, to ensure, one could argue, you're arguing to ensure competition, therefore the policy doesn't apply, and they're arguing to ensure the benefits of, and not necessarily competition, but to ensure the benefits of the marketplace. Yes, Your Honor. What 2210B says is the Public Utility Commission may not approve an acquisition if it finds that it's likely to result in anti-competitive or discriminatory conduct. Exactly. That's a big exception. That's a huge exception. I'm surprised that you went across the aisle and didn't start off with that in the first sentence of the brief. Well, Your Honor, that accept clause, what that accept clause does is it gives the Public Utility Commission the same power that other antitrust regulatory agencies have, the Federal Trade Commission, the Department of Justice, when confronted by an anti-competitive acquisition, they can, as we refer to it, fix it first. The parties that have proposed the anti-competitive acquisition may propose a change, such as divesting some of the assets so that the acquisition, as modified, is no longer anti-competitive. Now, equitable reaches a different interpretation of that section, but remember, it's their burden to show that the state has a clearly articulated policy, not an ambiguous policy, a clearly articulated policy to displace competition with respect to the conduct that they propose to undertake. Why is it wrong to say that the state here has a policy to displace competition with regulation? I know there's an issue about suppliers versus distributors, but forget that for a second. They can displace competition with regulation where it's determined that a merger is going to end the market competition that is necessary to ensure either suppliers or distributors, but end-users, consumers, the benefits of the marketplace which are compromised by the acquisition of market power they're being asked to approve. And if that's the case, if they're then being allowed to approve that under certain conditions to preserve the benefits of the marketplace, why isn't that a sufficiently articulated policy? If we look at that articulated policy, and this is a lot to watch, I'm sorry, it's really a question of foreseeability. The state is going to have to come up and say, you may not approve a merger which will have the consequences of being anti-competitive. They clearly don't have to say that. Your Honor, what section 2210B says, if an acquisition is anti-competitive, the public utility commission may nonetheless approve it on such terms and conditions as it finds necessary to preserve the benefits of a properly functioning, effectively competitive, retail natural gas market. Now the question is, what does that phrase mean? They're going to say it means that Pennsylvania has decided to replace competition with regulation. No, Your Honor. Yes, Your Honor, but that's not the correct interpretation of that section because that phrase, preserve the benefits of a properly functioning, effectively competitive retail gas market, appears twice in that section. And to interpret the phrase, it's necessary to look at how it's used both times. The first time that phrase appears, it appears after the initial admonition of that section. The public utility commission shall not approve an acquisition if it finds the acquisition is likely to result in anti-competitive or discriminatory conduct, including the unlawful exercise of market power, which will prevent retail gas customers from obtaining the benefits of a properly functioning, effectively competitive, retail natural gas market. The clause appears after which and after a comma. That's a non-rescriptive pronoun, the proper interpretation of that sentence. And you have to look at it that way because where a phrase appears twice, it's necessary to use the initial appearance to interpret the second appearance. The which clause indicates that properly functioning, effectively competitive, retail natural gas market is what disappears when there is anti-competitive or discriminatory conduct, including the unlawful exercise of market power. Does the PUC accept your interpretation? The PUC does not accept our interpretation, Your Honor, but that doesn't matter because when it comes to clear articulation, clear articulation has to come from the state legislature. And the Supreme Court said that in the Southern Motor Carriers case. The Supreme Court specifically stated that a state commission cannot articulate the policy. The policy has to be clearly articulated by the state legislature. Again, this is a policy that displaces an important protection of federal law. That's why the Supreme Court requires that it be clearly articulated, not ambiguously articulated. Pennsylvania could modify its law tomorrow to clearly articulate a policy to displace competition with respect to public utility acquisitions. And there are several cases in which states have done exactly that. We cite in our brief the Edmiston versus PIA Asheville Hospital. That's at 740 Fed Second, I believe it's page 247, and a case that we don't cite. And in that case, that is a Fourth Circuit case. The state of North Carolina specifically indicated that it wanted, or didn't believe, that the forces of competition were adequate to determine delivery of health care. It intended competition to be displaced with respect to acquisitions of hospitals. Similarly, in a case we did not cite, Askew versus DCH Regional. And that's at 995 Fed Second, page 1033. If you look at page 1040 in that case, 1993 decision from the 11th Circuit, You don't count cards, do you, mister? You don't count cards. Do you go to casinos? Can you count cards? I've had people cite cases before, but to consistently cite the volume and the page. Your Honor, 9 plus 4 is 1. Your Honor, line number 1 on the clerk's instruction said, Come prepared, I'm trying to do my best. In that case, in the Askew case, the state of Alabama articulated a policy to displace competition. Here, the state has articulated a policy to preserve competition. There is nothing in any case, such as section 2210b. What's funny here is that it seems to me that it may well be that competition is a means to an end. And we may well be at a point where we're looking at competition as the end of itself. Competition is to be valued in advance because we assume certain things will follow from the competition. Consumers will be advantaged in terms of pricing, in terms of services. All of those things will only be there to be maximized if there's some competition to bring those forces into the marketplace. But why couldn't there be a system of regulation designed to not necessarily preserve competition, but to preserve the benefits of the competition? And then, if you let me finish that, the way you would do that would be to impose a system of regulations to make sure that and actively patrol or actively supervise such things as standard of service, rates, discounts, accessibility to supply and distribution, and all those things are built into the PUC's responsibilities even after an acquisition. Why isn't that displacement of competition but assuring the benefits of competition by regulation? Your Honor, the state could clearly articulate a policy to do that, but that's not what it's done. It has made service, accommodation, convenience, safety, and those are the four horsemen that the Pennsylvania's Public Utility Commission has to check for before it can grant a certificate of public convenience with respect to an acquisition. It has made that a hurdle that an acquisition must cross. But it doesn't say it's the only hurdle. It could, but it didn't. An acquisition must cross that hurdle. The antitrust laws remain an additional hurdle that they can cross. Pennsylvania could clearly articulate a policy, but it can't do so ambiguously. The Supreme Court stressed in the Tycor case that the interests of federalism, political responsibility, are not well served. And, in fact, Your Honor, this quote is at 504 U.S. 629. In any event, they stressed that... We're going to check these out. It is. It's 504 U.S. The case starts at 629. I don't know about your legal argument, but I'm going to check it. In any event, Your Honor, the Supreme Court stressed that federalism and political responsibility are not well served when an important federal policy, such as the antitrust laws, is displaced by a regulation that's intended to have more limited ends. To determine whether the regulation is to have... whether it's intended to displace competition, the state has to clearly articulate it. It did not do so. Easily could have. Those other cases indicate and demonstrate how it could have. You're making more out of Thoreau articulation than we said in Yeager. You're making more, and I have no idea what page we sat at. Thoreau said the current articulation... What page was it when we talked about foreseeability? It was at 1267. Okay. 1267, Your Honor. The case is 22-3, 1260. We know that. I've got it right here. 1267, you're right. This court indicated that authorizing conduct is not clear articulation. It has to be foreseeable. It's interesting you say that, because the Southern Motor Carriers case uses words like sanction, which means, according to Webster's, approved, encouraged. It does not mean of necessity, expressly permitted. It does not mean of necessity, Your Honor, but the same day the Supreme Court issued the Southern Motor Carriers case, in fact, it precedes it in the volumes, it issued Towne-Calley v. City of Eau Claire. It doesn't have to expressly say it's displacing competition, but it has to be foreseeable. In Southern Motor Carriers... But this is clearly foreseeable, is it? No, Your Honor, it's not. Why isn't it? Because what the state has done is authorized acquisitions. Acquisitions are not inherently anti-competitive. Most acquisitions, in fact, are not anti-competitive. Webster specifically talks about market power and the kinds of acquisitions that they're empowered to authorize. Yes, but what it says is that the utility commission shall not approve an acquisition in Section 2210B. It shall not approve an acquisition. That one I even knew. I knew that was 2210B. Yes, it shall not approve an acquisition. Then there is ambiguous language at the end of the section which Equitable interprets one way, we interpret another way. There's no clear articulation of a policy to displace competition. I see the red light's on. I hope I can still have a few minutes. You have three minutes, exactly. I'll give you 80 seconds. Thank you, Your Honor. Thank you. Very good. Mr. De Niro, my beloved English teacher, Mary Spence, has got to be getting the last laugh. As you were talking about basically parsing the paragraph, I was listening to your argument. I remember her one day telling me, because I was doubting why I would ever have to diagram a sentence, and she said, young man, what career are you going to come a day when you have to learn how to diagram sentences? And I could see her up there, because she was a pretty ardent Catholic, I'm pretty sure she's up there if there is one up there, saying to me that she was right. So I appreciate that. You've got me into diagramming sentences now. Good morning, Your Honor. May it please the Court, my name is George Carey, and I and my colleagues at Clued Out Leave and Reed Smith are here on behalf of Defendant Equitable Resources, and I'll be arguing for both equitable and dominion today. Why is he wrong about the foreseeability argument? He's wrong about the foreseeability argument because he ignores the entire Title 66 of the Pennsylvania Code when he comes to that conclusion. He takes one section out of context, doesn't even include the entire section. The question on reasonable foreseeability here is, is it reasonably foreseeable that in exercising its pervasive regulatory authority, the Public Utility Commission would approve a merger that violates, according to the FTC, Section 7 of the Clayton Act? 2210 does not say the PUC shall not approve an acquisition that lessens competition in any line of commerce or any section of the country. That's the language of Section 7. He's right about this much of it. The state legislature is specifically authorizing an anti-competitive merger in that section. That's correct. And the state legislature, in the context of the entire section, Title 66, makes clear that it's up to the PUC to balance all of the elements that are there. 2210 talks about, if the commission finds, after a hearing, the commission shall, and it goes on to talk about what the commission shall do, and it talks about preserving the benefits of a properly functioning and competitive retail natural gas market. You're really focusing on, and I think it is important, the word benefits. Absolutely. It's not the competition that's being preserved, but the benefits of competition. That's right. And, in fact, there are other sections throughout the Code. If one looks at 2209, it talks about mitigating market power through regulation. If you talk about the overlay of Pennsylvania law, which includes specific direction from the Pennsylvania courts, that the PUC is to look out for the benefits of all consumers in all geographic subdivisions. You can't pick a particular group of consumers, as the FTC is doing, and say, we're going to protect these people at the expense of everybody else. Pennsylvania law is very clear about this. But I think, and I can't remember, I don't have this memory, thank goodness, because I can't remember, I was with all this stuff in my mind, if I can recall. Somewhere, you talked about there being a federal policy that protects competition for all. And if there's a policy which results in the loss of the market benefits, to use your phrasing of it, for one consumer or one group of consumers, that is an anti-competitive result that is frowned upon under the FTC. Well, that's not what they say in their complaint, Your Honor. In their complaint, paragraph 26, they define the market as, the relevant geographic market in which to analyze the effects of the proposed acquisition is the individual service location of each customer. They're looking at each customer as a separate market, and then they're saying, you cannot, at page 12 of their brief, you can't look at the effects on everybody else because they're outside the market. The Pennsylvania legislature has told the PUC something quite different from that. It's told them you have to look at the benefits of all the consumers, you can't prefer some, it says you won't discriminate. The PUC here found that the very discounts that the FTC would preserve violate Pennsylvania law because they're unreasonably discriminatory. Well, how does the competing definition of the market, and I think there are two definitions of the appropriate market here, how does that impact on the doctrine, the state immunity doctrine? It impacts on the doctrine, Your Honor, because the Pennsylvania public policy is to look for the benefits of all consumers to eliminate unfettered business freedom in public utilities. What you have here is a completely and pervasively regulated public utility. They can't set their prices without PUC approval. They can't enter new geographic territories. They can't unreasonably discriminate between customers. They can't set their own safety standards. Pervasively regulated utility, and under Pennsylvania law, the PUC is to set the extent of competition. This court in Mogulton made it clear that you look to the PUC to set the extent of competition, and the fact that they allow some competition doesn't mean that state action doesn't apply. The court in Sayre, the Pennsylvania court in Sayre made clear that it is up to the PUC to determine the extent of competition. But if it's up to the PUC to determine the extent of competition, how is that consistent with an exam that requires the displacement of competition, substituting that for regulation? Right. As Mobile Phone made explicit, as this court said in Mobile Phone, the fact that the scheme allows some competition does not negate state action, does not negate the idea that unfettered competition has been displaced with regulation. So under Mobile Phone and under Yaeger, it is up to the PUC to decide the extent of that regulation in furtherance of the state's goals of pervasive regulation. Yeah, but Mr. Currie, you're confusing me versus what your briefs argue. And, I mean, you argue in your brief from page 19 that the PUC approval of the transaction is clear articulation. Yes, Your Honor. And that's essentially what you're saying here today. But I'm having trouble, other than the language that you refer to in 2210B, finding where the Pennsylvania General Assembly clearly articulated that they were going to displace the need to have a competitive market and therefore allow us to say that the state action doctrine precludes the FTC from being involved. I just don't see that. I don't see it in Section 1102B. I don't see it in any of the sections. And perhaps you can point me to where it is that the Pennsylvania legislature said and clearly articulated their policy. Yes, Your Honor. If I may, I'll start first by just going to the precedent that defines clearly articulated. Southern Boat of Carriers talks about just and reasonable rates. That's the legislative mandate in that case. Xavier talks about lodge management. Mobile phone talks only about the fact that... Where was the Pennsylvania legislature on mobile phone? It defined pagers as public utilities. That was the extent of the legislative mandate in that case. You're not answering my question. I want to know where the Pennsylvania legislature clearly articulated this policy. Right. Here what we have is First 1102, which requires that no acquisition can occur by a public utility without a certificate of public convenience. That has been found in other cases, as the ones I've just recited, to be a clear articulation. That's a general provision. It's a general provision. It then goes on in Section 1301 to talk about just and reasonable rates, exactly the same language that was found to displace the Southern Boat of Carriers. It then says that a utility cannot charge more or less than the amount specified by the PUC in 1303. They can't change their rates in 1308, can't set rates of its own choosing, and the PUC can set those rates under 1309. No unreasonable discrimination in rates under 1304, and you can't expand your geographic area in 1102. All of that together, plus all of the rest of the code, precludes unfettered business freedom. Well, it seems that all those things are all going to go to active supervision of the conduct, which is part of the Thai Court test, but I'm not sure it really enters Judge Fisher's inquiry in terms of where you get the clear articulation, even if you look at clear articulation through the Yeager lens, how that comes out, especially since the Supreme Court said in Thai Court that this doctrine is not a favored doctrine. What the Supreme Court said in Midtow is that if the state has replaced, displaced unfettered business freedom with comprehensive regulation, that is a clear articulation of an intent to displace competition. That's what we have in those general provisions of the statute that I've just recited. The Public Utility Code displaces unfettered business freedom with regulation. In the PUC's action in approving this transaction, they have very directly said that the minimal amount of distribution competition at the expense of the other rate payers, subsidized by the other rate payers, is against the public policy of the state. In Yeager, this court said one has to look at Pennsylvania law, and Pennsylvania law defers the judgment to the PUC. I have the same question as Judge Fisher. Your lead point at page 19 is PUC approval of the transaction. It's clear articulation. Shouldn't it be provisions of the cost, some legislative provision? When you get to 2210B, which I thought was great provision, I'm reading around saying, wow, that except for the very important provision, that's at page 38. I would think that should be almost a lead off. The statutory provisions under which the PUC can approve, as opposed to the approval itself, showing what the legislature intended to do. Am I making myself clear? You absolutely are, Your Honor, and I must say that in all candor, we went back and forth on which argument to put first, and I guess we chose the wrong one. Right. You're absolutely right. Judge didn't spend a lot of time on 2210B either. That's where the argument, that's the fulcrum here. Just let me read one portion from Southern Motor Rate Carriers, which I think puts this in context. If I can find it. Unfortunately, I don't have the same number here. It's a citation. My colleague. I wish it wasn't there. Southern Motor Rate Carriers makes explicit that the legislature need not specify the particular anti-competitive conduct that is an issue in the case. What we have here is this pervasive regulation, a statute that mandates how the PUC is to apply the standards, and in all of that, the PUC has done exactly the kind of regulatory determination that is required. It has decided, for example, that 600,000 people will benefit from supply competition and that that overwhelms 500 people losing distribution competition, which after all is something that consumers across the country don't have. I guess that's where I get hung up here because then you're still saying that the policy is to promote competition. The policy in supply is to promote competition. What the courts have made clear is, under Mobile Phone again, under Sayre, the fact that some competition is allowed into the equation does not negate state action immunity. The PUC can allow some competition without losing state action immunity. In distribution, same thing? You're focusing on the allowance of the supply competition. Your argument is the same, that you do allow competition for distribution? I think the Pennsylvania Public Utility Commission has made clear that distribution, gas-on-gas distribution competition, something that only, as far as we can tell, occurs in Pittsburgh for historical reasons, is not in the public interest, and there's no legislative mandate that requires them to continue that competition. Let's try to get to the legal questions. I'm reading this and trying to get a handle on just how things worked on the ground. It's obvious why gas-on-gas distribution competition is not really efficient, but why wouldn't the same kind of consideration pertain to the intrastate distribution from point A to point B? Once you deal with the commodity, commodity comes out of the ground, and you're talking about the pipeline to get it to the point where it's then distributed to the end user. Wouldn't you have the same kind of consideration there? Why build dual pipelines to transfer that? I think that the history is that different pipelines come from different areas, and the thought is that you can get the gas to the local area without the problems associated with having pipes running down the same streets, having multiple companies servicing those pipes, having to replace dual infrastructure, and having all that come at the expense of the captive customers, which account for 99.1% of the customers in this case. The quote from Southern Motor Carriers that I was looking for is, requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness. So what we have here is a statute that says  We have the courts of Pennsylvania mandating that the PUC look to the benefits of all customers, not just a few. And we have the PUC making the judgment that enhancing supply competition, improving the efficiency of distribution in this case, reducing costs, inures to the benefit of all customers. And we then specifically have them say, discrimination, unreasonable discrimination, is what's going on here with respect to these below-cost discounts that these customers are able to get subsidized by the other ratepayers. And the Public Utility Commission says it is this that must be reversed. There is a specific statute that deals with discrimination. So the PUC is doing what they were mandated to do. They're looking at the entire environment in which these utilities operate. They're looking for the benefits of all consumers. They're saying that this is inefficient competition that's going on, and it is at the expense of efficiencies that could otherwise be realized, economies of scale, reducing duplication. That's why public utilities are regulated. They are natural monopolies. That's what we have here. And preventing the citizens of Pennsylvania from gaining those benefits in an entirely intrastate transaction in order to benefit 500 customers who are currently being subsidized creates a clear conflict between the federal enforcement of the antitrust laws and the public interest mandate of the PUC. But Mr. Dwyer-Wyman is right, though, about the nature of the 500 customers, isn't he? I mean, it's misleading to say these are only 500 customers because of the pass-through, the impact that might happen, say, in Duquesne if the utility rates go up there. It may be 500 actual bill-paying customers, but the effect is going to be much broader than that. Well, I will accept his extra-record amendment when he says maybe it's thousands or even tens of thousands. On the other hand, we're talking about 634,000 Pennsylvania residents, people in their homes, people in their businesses, all of whom are paying the bill to preserve the discounts that these few customers are getting. Yeah, but hasn't the PUC said separately that no longer will you be able to recoup those costs that you lost in your discounts against the remaining part of the rate base? They have said that. That's certainly something that they were entitled to say under Title 66. And if that ruling holds, if they could change it from time to time, if that ruling holds, that's certainly going to be a deterrent in the marketplace for competitors to go out and try to lower the price against one another because they're not going to be able to make it up anywhere else. That's exactly right, Your Honor. The amount of competition we're talking about here is even less than the FTC would have it. And to prevent the incredible efficiencies, compelling efficiencies... But isn't that to be determined elsewhere? And the PUC, it seems to me, has performed their role in saying you can't offset it. And the marketplace is going to end up, if in fact two companies remain, the marketplace is going to end up determining whether or not those companies will continue to offer discounts. But the PUC has also said, Your Honor, that this combination creates compelling efficiencies, compelling cost reductions. Those will all be sacrificed. So ratepayers will end up paying more, even if these discounts go away because they will not gain the benefit of these efficiencies. And under the State Action Doctrine, it is up to the State to decide. Well, wait a minute. Why is that? Because the PUC can control the rate, whether or not there's any merger. Right, but the merger creates efficiencies, eliminating the duplication, allowing for blocked Pennsylvania gas to move into the system. Well, that's on the companies, though. It does eliminate the inefficiencies, but that's on the companies. They're going to have to eat that if it doesn't go through. Well, that's right. But the point is that the ratepayers will have to eat that because by reducing the cost of providing the service, they'll keep energy costs down. And the PUC has found those efficiencies to be compelling. Right, but I'm saying that energy cost can't be passed through unless the PUC lets it be passed through to the ultimate consumer. Right, but in terms of the efficiencies, it's clear that the utility is entitled to return on its investment. There's only two ways to get that. You bring the cost down through efficient mergers like this one, or you raise your rates. That's the only way to get to the rate of return that Pennsylvania allows for the utility. They chose to do it the way that benefits consumers, by bringing costs down. The FTC says, no, you can't do it that way. Our position is that under the State Action Immunity Doctrine, the State gets to decide for a completely intrastate transaction affecting only Pennsylvania residents what the right decision is. And the State has decided this deal is good for consumers. I thought it was being totally intrastate in this day and age. I'm not sure anything is totally intrastate now. But I understand how you're using it in your argument. Thank you. Thank you, Your Honor. Your Honor, of course, as you pointed out, the State of Pennsylvania, to the extent that it's concerned about the rates that the public utilities have been charging in the past, they have the authority, pursuant to Section 13, they have the authority, pursuant to their rate-making authority, to deal with the rates that the companies are charging. The fact is that their authority over rates is too attenuated from anti-competitive acquisitions to suggest that authority to regulate rates is a clear articulation of a policy. But it's not just authority to regulate rates. That's where it's the clearest. Excuse me, but service, I mean, that would be one of the, I mentioned that to you in my earlier article. Yes, Your Honor. That's one of the clear benefits of competition. If the customer is not getting good service, if you're stuck with bad service, unless there's another company you can threaten to take your business to, they can regulate standards of service as well as rates. They can, Your Honor, but that's not a displacement of the antitrust laws. The statute, Section 1103 of the Utility Code, says that an acquisition cannot go forward unless it promotes service accommodation, convenience, or safety. These are qualities that are enhanced by competition. A law that promotes qualities that are enhanced by competition is no clear articulation of a policy to displace competition. Again, the antitrust laws are an important federal policy. The state can only displace them with a clear articulation of a policy to do so. Section 2210, although it has language that they interpret one way, we interpret another, and I suggest that our interpretation is a better interpretation than theirs. But in any event, there's absolutely no clear articulation of a policy there to displace competition. The benefits of a properly functioning and effectively competitive retail natural gas market, those are what is lost when the antitrust laws are violated. Well, unless there's a system of regulation that can be put in place to make sure those benefits continue. Yes, but the system of regulation that exists promotes qualities that are enhanced by competition, not displaced by it. The mere fact that the state regulates in an area is no displacement of competition. It's only if it does something that foreseeably allows something that's anti-competitive. This regulation promotes qualities that are enhanced by regulation. When you have cases, such as the mobile phone case that they cite, where mobile phone challenges the rates that its competitor is going to be charging. In the mobile phone case, Pennsylvania had articulated a policy through a statute that declared that paging was a public utility. What that meant under Pennsylvania law was that rates were no longer going to be set by the free market as they would be in any other industry, and that entry and the area that a company could serve would no longer be governed by the free market. It's governed by regulation. Mobile phone challenged the impact of regulated rates by its new competitor, Commonwealth Telephone, on its business. It is foreseeable that a regulated rate, a rate set in a system other than competition, will foreseeably have an anti-competitive effect. That's what mobile phone was challenging. And therefore, the state action exemption would apply to that sort of conduct. It is foreseeable. I don't have to wrap it up. We've got a couple more cases. We can't do this. If the doctrine was going to be looked at this way, it would have to be the Supremes telling us to do it, not us. But just in terms of an analytical handle, if one of the purposes of the second part of the regulation is to ensure that once you allow these deals to go forward, the private parties who normally would be motivated by and act only in their private interest can't do that. Their actions don't have to be driven by a public concern, but they're going to be controlled by the public interest. So you have private parties who have to now act for the public good, even if it's to the detriment of their private interests. If you look at the whole doctrine through that lens, then doesn't the kind of regulation that we have here, particularly under 2210B, doesn't that get you to exactly the kind of concern in terms of preserving the benefits of the anti-competitive market in a non-competition merger that the doctrine is designed to get at? No, Your Honor, because the second part of the Mid-Cal test, you only get to that when you can determine what the state policy is. But we can't do that. You can't do that, and there is no clear state policy here. Pennsylvania could modify its law to clearly articulate competition. It hasn't done so here. This court, therefore, there is no state action exemption. This court should overturn the district court's decision, remand to that court so that it can address the merits of the Federal Trade Commission's challenge. Mr. DeMille, thank you. Thank you, Your Honor. Mr. DeMille, thank you very much. Your ability to cite cases will not be the standard against all other counsel in the measures. I may never live long enough to see another attorney who can do that. Thank you very much. A very, very helpful argument on both sides and a very, very difficult case to think of and serve. Thank you. I'm just wondering how many billables are walking out of the room right now. They weren't all here for the first case. No, they were all here for the whole case. I'm just not being nervous. Is that what you're saying? Well, they're coming to me. They wouldn't send anybody down today. You're sitting outside of this. Thank you. Thank you.